UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


DAVID PIERCE,                        )
                                     )
              Plaintiff,             )    CIVIL ACTION NO.
                                     )    10-12091-DPW
                                     )
         v.                          )
                                     )
COTUIT FIRE DISTRICT, BOARD          )
OF FIRE COMMISSIONERS OF THE         )
COTUIT FIRE DISTRICT, DONALD         )
CAMPBELL, RONALD MYCOCK, AND         )
PETER D. FIELD, FIRE                 )
COMMISSIONERS OF THE COTUIT          )
FIRE DEPARTMENT, and                 )
CHRISTOPHER OLSEN, FIRE CHIEF,)
                                     )
              Defendants.            )


MEMORANDUM AND ORDER
March 20, 2013


     Plaintiff David Pierce brings this action asserting a claim

under 42 U.S.C. § 1983 for political discrimination and unlawful

retaliation in violation of the First Amendment, as well as

claims for tortious contractual interference under Massachusetts

common law and for violation of the Massachusetts Whistleblower

Act, Mass. Gen. Laws ch. 149 § 185.  The Defendants--the Cotuit

Fire District, its Board of Fire Commissioners, certain

individual Commissioners, and its Fire Chief--move for summary

judgment on all claims.

**I. BACKGROUND**

     The Cotuit Fire Department is a relatively small operation.

As of 2008, the Department had one Fire Chief, who was
responsible for all personnel and for administering day-to-day
activities, and one Captain, second in command only to the Fire
Chief.  Below those officers in the chain of command were three
full-time Lieutenants (formerly known as Senior Privates), six
full-time firefighters, and five "call" firefighters (part-time
trained professionals available on an as-needed basis).  The
terms of employment for all these members of the Department were
governed by a collective bargaining agreement ("CBA") between the
Cotuit Fire District and the Cotuit Permanent Firefighters Local
3642.  A three-member Board of Fire Commissioners ("the Board")
oversaw the Department and appointed its officers, but typically
relied upon the officers for day-to-day personnel management.

     David Pierce began working at the Department in 1979 as a
"call" firefighter.  By 1989, he had worked his way through the
ranks to become Captain of the Department.  As Captain, Mr.
Pierce had authority over all personnel below his rank; thus he
was the officer in command at incidents unless the Chief was also
present.

     In September 1998, David Pierce married Jayne Pierce
(formerly Mary Jane Trainor), who began working as a full-time
firefighter at the Department in 1994 but was promoted to Senior
Private sometime in 1998.  David Pierce was previously married to
Donna Pierce, who was a call firefighter at the time.  They

divorced, and Donna Pierce became Donna Fenner after marrying
Scott Fenner; both were full-time firefighters at the time.
Scott Fenner had previously been married to Amy Griffin Fenner, a
call firefighter for the Department. In short, the Cotuit Fire
District was no stranger to intra-Departmental domestic
relationships.

Ronald Mycock became a Commissioner in 1995, quickly
realized there were "significant personnel issues" at the
Department, and specifically complained to then-Chairman Stu
Goodwin about David Pierce and his wife at the time, Donna,
serving together in the Department.  Various firefighters felt
that personal relationships within the Department were an
embarrassment.

As pertinent to this case, under standard Department
scheduling, David Pierce and his wife Jayne worked two 24-hour
regular shifts per week.  Although for some time they had worked
the same two days per week, the Pierces rearranged their schedule
after their marriage so that they had no regularly-scheduled
shifts together.  The Pierces, however, still had occasion to
serve on the same shift together when, for example, the two would
report to emergency incidents, or when one would substitute for
another absent firefighter during the other's regular shift.  In
those instances, David Pierce would be in a position of
supervising his wife.

In March 2008, while David Pierce was in the process of applying to replace retiring Fire Chief Paul Frazier, he wrote to Massachusetts State Ethics Commission requesting an advisory opinion regarding the potential conflict-of-interest problems under the state ethics laws stemming from his marriage to Jayne. On March 31, 2008, the Ethics Commission advised him that the state ethics laws would not necessarily preclude him from serving as Chief.  The Commission advised, however, that the ethics laws did not allow Mr. Pierce to participate in his wife's supervision, performance evaluations, promotion and compensation, Mass Gen. Laws ch. 268A § 19, to use his position to secure unwarranted privileges for her, *id.* § 23(b)(2), or otherwise to engage in conduct giving a reasonable person the impression that his marriage was influencing his official duties, *id.* § 23(b)(3). The Ethics Commission recommended that Mr. Pierce make written disclosure of his circumstances to the Board and to seek a waiver of the conflict of interest.  *See id.* §§ 19(b)(1), 23(b)(3).  Mr. Pierce took no such action at the time.

Jayne Pierce also competed to become Fire Chief, but both she and her husband were unsuccessful.  Christopher Olsen became the new Chief in July 2008.  Early in Olsen's tenure, in the Fall of 2008, he and David Pierce had a disagreement about whether new Lieutenants to the Department should be subject to a probationary period.  The decision would have affected Jayne Pierce's

-4-

employment.  Mr. Pierce advocated against the probationary
period.  Also that Fall, the Department was creating a new EMS
position.  Olsen sought opinions about filling the position.  Mr.
Pierce felt that the position should be filled by a person who
was both an officer and a paramedic--a category of one:  Jayne
Pierce.

In March 2009, Olsen circulated a draft "Familial Relations
Policy."  Among other things, the policy prohibited non-emergency
assignments of family members to the same shift and, by building
an additional level of supervision into the schedule, sought to
insure that, where possible, family members would not report
directly to each other.  Concerned about the implications, Mr.
Pierce obtained legal counsel shortly after the policy was
circulated.  Meanwhile, on April 10, 2009, Jayne Pierce got into
altercation with subordinate firefighter Brent Lyons, in part
regarding the draft familial relations policy.

Sometime in late April 2009, David Pierce approached William
Wool to encourage him to run for Fire Commissioner.  Wool ran as
a write-in candidate against incumbent Donald Campbell, a former
union firefighter, who was otherwise unopposed.  Mr. Pierce
opposed Campbell in part because he felt it was problematic to
have someone with Union ties on the Board.  Until the election on
May 26, 2009, Mr. Pierce campaigned for Wool by handing out
flyers, talking to people, and displaying a campaign sign.

Mycock, through Olsen, advised Mr. Pierce not to campaign on duty and not to use Department materials in campaigning.

On one occasion, Mr. Pierce declined to report to an emergency call while he was campaigning outside the town Post Office.  Olsen drove by Mr. Pierce on his way to the call, and signaled to him that "something was going on."  Mr. Pierce alleges that, the next day, Olsen indicated that he wished Mr. Pierce had responded to the call because they were short of help. According to Mr. Pierce, Olsen also said at some point during the campaign that he was worried about losing Campbell as Commissioner because he supported hiring additional staff.

Wool lost the election.  Mr. Pierce alleges that, after the election, Olsen said he wasn't happy that Mr. Pierce had been campaigning at the Post Office and felt it was "inappropriate" for Pierce to have been campaigning on another occasion outside the fire station.  Mr. Pierce also alleges he had a conversation with Campbell in which Campbell initially expressed that he had no hard feelings towards Mr. Pierce, but Campbell eventually became frustrated and upset with him.  Mr. Pierce alleges that Olsen and Campbell had a close friendship, which included a joint golf trip to Florida and other more routine social interactions.

Chief Olsen wanted Mr. Pierce involved in investigating the April 10, 2009 incident involving his wife and Lyons; Olsen thought Mr. Pierce's experience would be valuable.  Jayne Pierce,

-6-

however, requested that her husband not be involved, because both
she and Lyons viewed his participation as a presenting conflict
of interest.   Olsen gave Mr. Pierce the opportunity to recuse
himself, but he declined.   Mr. Pierce says he was worried about
the consequences if he could not participate in the
investigation, but admits that Olsen did not threaten adverse
employment action if he declined to participate.   Mr. Pierce
recommended that Jayne Pierce and Lyons receive a counseling
session; Olsen, however, decided to demote Jayne Pierce from
Lieutenant to firefighter.

        After the incident involving Jayne Pierce and Lyons, the
Board received guidance from legal counsel regarding the state
ethics laws.   In the following months, five full-time
firefighters--roughly half the Department--made complaints about
the Pierces.

        On October 2, 2009, Mr. Pierce sent a letter to the Board,
which he now characterizes as a "whistleblower complaint."   In
the letter, Mr. Pierce claimed that Olsen had been retaliating
against him and his wife since the election, based on his
political activity and specifically his support for William Wool.
He cited a variety of forms of harassment.   For example, he said
Olsen reneged on his purported wish to make Mr. Pierce "Deputy
Chief."   He also complained that Olsen took over his office and
made him return his Department-issued cell phone.   On one

occasion Olsen allegedly called the Pierces "greedy," and on another occasion allegedly lashed out at Mr. Pierce.

The Board responded with an October 14, 2009 letter indicating that Mr. Pierce's letter did not conform to the grievance process prescribed by the CBA, and in any event did not request or suggest any particular course of action the Board should take.  However, given that Mr. Pierce's letter advocated for both himself and his wife, the Board took the opportunity to raise the issue of conflicts of interest and potential violations of the state ethics laws with Pierce.

On November 10, 2009, Olsen distributed a memorandum reminding members of the Department about their obligations under the state ethics laws; the letter included a copy of the State Ethics Commission's Advisory Opinion on Nepotism.

On November 20, 2009, the Board sent a complaint to the State Ethics Commission, requesting that the Commission conduct an independent evaluation of Mr. Pierce's potential conflict of interest.  Among other things, the letter informed the Ethics Commission that Mr. Pierce had "regular supervisory authority over and day to day supervision of his wife," and that Mr. Pierce had participated in a disciplinary matter involving his wife. The letter was signed by Commissioners Mycock and Field, but not Campbell, who had resigned the day before.

By letter post-marked November 24, 2009, Mr. Pierce made

-8-

formal written disclosure to the Board regarding the circumstances of serving in the Department with his wife, and requested an exemption pursuant to Mass. Gen. Laws ch. 268A, § 19(b)(1).  The letter disclosed that Mr. Pierce supervised his wife on ten to twelve occasions per year.  The Board did not take up Mr. Pierce's request while it awaited a response from the Ethics Commission regarding its November 20 complaint.  The Board submitted additional detail to the Ethics Commission in a February 3, 2010 letter.

In April 2010, Mr. Pierce filed a charge of prohibited practice with the Massachusetts Division of Labor Relations ("DLR") regarding a reprimand he received from Olsen following a grievance he filed to recover certain educational reimbursements due under the CBA.  The complaint was later withdrawn with prejudice.

On June 17, 2010, the Ethics Commission sent Mr. Pierce a confidential letter informing him that, based on his supervision of his wife, he appeared to be in violation of Mass. Gen. Laws ch. 268A, § 19.  The Commission suggested that:  (1) Mr. Pierce should attempt to obtain an exemption; (2) he should attempt to restructure his position to have no day-to-day supervision of his wife; or (3) he or his wife should resign.

On June 18, 2010, Olsen notified Mr. Pierce of his intent to suspend Mr. Pierce with pay, which he did following a hearing

later that month.  There is no indication in the record that
Olsen was aware of the Ethics Commission's confidential June 17
letter to Mr. Pierce at the time.

On June 24, 2010, Mr. Pierce responded to the Ethics
Commission, contesting the factual premises of its opinion--and
more specifically, arguing that he did not have "day-to-day
active supervision" of his wife.  On July 22, 2010, Mr. Pierce
initiated a "step one" grievance with Olsen, as prescribed by the
CBA, regarding the propriety of his suspension with pay.  On July
26, 2010, the Board sent the Commission another letter responding
to Mr. Pierce's June 24 letter, again raising the issue of
supervision, as well as the issue of his involvement in matters
relating to discipline and promotion of his wife.

After conducting its own investigation, on January 11, 2011
the Ethics Commission sent Mr. Pierce another confidential
letter, informing him the Commission found "facts sufficient to
find reasonable cause to believe" Mr. Pierce violated Mass. Gen.
Laws ch. 268A, § 19.  The Commission specifically relied upon the
instances in which Pierce advocated for his wife to receive a
newly-created EMS position in October 2008, and his involvement
in investigation of the April 10, 2009 incident.  Although the
Commission chose not to institute adjudicatory proceedings
against Mr. Pierce, it warned him not to participate in
employment matters regarding his wife, and again admonished him

that day-to-day supervision of his wife would be prohibited.

Following a November 23, 2010 hearing, at which the Commission's June 17 letter to Mr. Pierce was discussed, Olsen suspended Pierce without pay on November 29, 2010.

On December 3, 2010, Mr. Pierce initiated this action, asserting his claims for political discrimination and retaliation, 42 U.S.C. § 1983, violation of the Massachusetts Whistleblower Act, Mass. Gen. Laws ch. 149, § 185, and tortious interference, as well as a claim for violation of the Massachusetts Open Meeting Law, Mass. Gen. Laws ch. 39A, §§ 18-25.  Mr. Pierce also filed on December 3, 2010, a "step one" grievance to Olsen regarding his suspension without pay.  On December 19, 2010, Mr. Pierce filed his "step two" grievance with the Board regarding his suspension without pay.

Plaintiff filed an amended complaint on January 5, 2011, withdrawing his Open Meeting Law claim, which he later re-filed in state court.  On May 5, 2011, I allowed Mr. Pierce to dismiss his whistleblower claim without prejudice.

At an April 20, 2011 hearing, the Board terminated Mr. Pierce.  The Board discussed the Ethics Commission's June 17, 2010 letter to Mr. Pierce, and also noted that the investigation of the Ethics Commission had been concluded, but the latter was not discussed in detail due to a protective order issued by this court.

On May 8, 2011, the Union and the Board entered into a settlement agreement that permitted Mr. Pierce to return to work as a full-time firefighter, but not in his position as Captain, and restricted his ability to work on any shift with his wife. The Union, for its part, withdrew with prejudice a scheduled arbitration regarding Pierce's suspensions, as well as a grievance regarding Pierce's discharge.  Mr. Pierce objected to the settlement, but eventually did return to work.

On August 4, 2011, I allowed Mr. Pierce to reinstate his whistleblower claim in this action.  On August 23, 2011, he filed another complaint with the Massachusetts DLR, this time objecting to the settlement agreement.  The DLR ultimately dismissed the complaint finding that there had been no breach by the Union of the duty of fair representation in settling the grievance.

Meanwhile, the Defendants undertook summary judgment motion practice in this case.

## II. STANDARD OF REVIEW

Fed. R. Civ. P. 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).  The question is whether there is a "genuine dispute as to any material fact."

Fed. R. Civ. P. 56(a); *Casas Office Machines, Inc.* v. *Mita Copystar Am., Inc.*, 42 F.3d 668, 684 (1st Cir. 1994).

### III. POLITICAL DISCRIMINATION

David Pierce claims in Count I of his complaint that he was subject to discrimination and retaliation based on his engagement in protected political activity, a violation of his First Amendment rights actionable under 42 U.S.C. § 1983.

To establish that Defendants, as Mr. Pierce's employer, violated his right to free speech, Mr. Pierce must show that: (1) he spoke as a citizen on a matter of public concern; (2) his First Amendment interest and the interest of the public outweigh the government's interest in functioning efficiently; and (3) that his protected speech was a substantial or motivating factor in adverse employment action against him. *Welch* v. *Ciampa*, 542 F.3d 927, 938 (1st Cir. 2008). Adverse employment actions are those that would chill the speech of "reasonably hardy individuals." *Barton* v. *Clancy*, 632 F.3d 9, 29 (1st Cir. 2011)

If Mr. Pierce can establish a *prima facie* case that Defendants took adverse employment action against him based on his political activity, Defendants can still avoid liability by showing by a preponderance of the evidence that they "would have reached the same decision . . . even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ.* v. *Doyle*, 429 U.S. 274, 287 (1977).

**A.    *Relevant Activity***

At the outset, I address the parties' disputes as to the relevant protected activity in which Pierce engaged.

1.    William Wool Campaign

The heart of the complaint is that Defendants engaged in retaliation against Mr. Pierce because he campaigned for William Wool, activity that is undisputedly protected speech on a matter of public concern and protected by the First Amendment.

2.    October 2009 Letter

Mr. Pierce also alleges retaliation based on his October 2, 2009 letter to the Board complaining about Olsen's treatment of him and his wife.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement." *Connick* v. *Myers*, 461 U.S. 138, 147-48 (1983). Although the letter leads with the notion that Olsen retaliated against Mr. Pierce for supporting Wool, the letter goes on to address a series of grievances personal to the Pierces that "created stress upon" the family.

In some respects, this case bears resemblance to *Connick*, which involved an assistant district attorney who was terminated after circulating a questionnaire to other assistant district attorneys asking if they felt pressure to work in political campaigns.  The Court found that "the issue of whether assistant

-14-

district attorneys are pressured to work in political campaigns
is a matter of interest to the community upon which it is
essential that public employees be able to speak out freely
without fear of retaliatory dismissal." *Connick*, 461 U.S. at
149.  The public may have a some interest in political pressures
imposed on firefighters, although that interest is perhaps more
attenuated than worries about ostensibly non-partisan prosecutors
facing partisan political pressure.

In any event, the form of Pierce's speech was meaningfully
different from that in *Connick* in that it involved a private
grievance to the Board.  "[W]hen a public employee speaks not as
a citizen upon matters of public concern, but instead as an
employee upon matters only of personal interest, absent the most
unusual circumstances, a federal court is not the appropriate
forum in which to review the wisdom of a personnel decision taken
by a public agency allegedly in reaction to the employee's
behavior." *Connick*, 461 U.S. at 147.  As the Supreme Court has
more recently explained, "[a] petition filed with an employer
using an internal grievance procedure in many cases will not seek
to communicate to the public or to advance a political or social
point of view beyond the employment context." *Borough of Duryea*
v. *Guarnieri*, 131 S. Ct. 2488, 2501 (2011).  Recognizing this
distinction is essential to protect against "transform[ing]
everyday employment disputes into matters for constitutional

litigation in the federal courts."  *Id.*

Given that Mr. Pierce's letter is directed only to the Board and addresses largely personal issues--as opposed to, say, pervasive political discrimination in the Department--I view the letter as an employee grievance about his immediate supervisor rather than protected speech on a matter of public concern.  That said, in the interest of completeness regarding the analysis applied in my resolution of the Defendants' motion, I will proceed alternatively on the assumption that the letter is protected petitioning activity.

### 3.   Jayne Pierce's Petitioning Activity

Defendants next argue that Mr. Pierce cannot claim retaliation based on his "perceived involvement" in his wife's petitioning activity, in the form of her separate June 23, 2010, complaint against the Defendants for sex discrimination, Mass. Gen. Laws ch. 151B, § 4, and violations of the Massachusetts Open Meeting Law, Mass. Gen. Laws ch. 39A, § 23B.  Defendants are surely correct that Pierce cannot automatically impute his wife's speech to himself; Mr. Pierce must have engaged in his own protected speech to claim retaliation for petitioning activity.

I note that the Second Circuit has recognized that adverse action against one spouse based solely on conduct of the other spouse may violate a First Amendment right of intimate association.  *Adler* v. *Pataki*, 185 F.3d 35, 44 (2d Cir. 1999).

-16-

Plaintiff, however, has failed to develop any such theory.  Beyond the fact that he failed to argue this theory--or any theory, for that matter, about Jayne Pierce's petitioning activity--in his opposition to summary judgment, the record reflects nothing more than the fact that some of the adverse actions taken against Mr. Pierce followed the filing of his wife's complaint.  "The mere fact that an adverse action was taken after an employee exercises First Amendment rights is not enough to establish a prima facie case." *Maymi* v. *Puerto Rico Ports Auth.*, 515 F.3d 20, 28 (1st Cir. 2008).

### 4.   April 2010 DLR Complaint

Finally, Mr. Pierce's April 2010 DLR complaint is not relevant protected activity.  That complaint involved educational reimbursements entirely personal to Mr. Pierce and his wife, and does not constitute speech on a matter of public concern.

## B.   *Fire Commissioners*

Defendants argue that Mr. Pierce has failed to establish a *prima facie* case against the Board of Fire Commissioners and Commissioners Campbell, Mycock, and Field.  I agree.

### 1.   Campbell

Campbell resigned from the Board before Mr. Pierce was subject to any adverse employment action, and thus cannot have actionably retaliated against him.  Mr. Pierce points to the October 14, 2009 letter from the Board raising conflict of

-17-

interest issues, but this letter merely asked Mr. Pierce to seek an advisory opinion from the State Ethics Commission and does not alone constitute material adverse action.   By the time the Board submitted its own complaint to the State Ethics Commission in November 2009 , Campbell had resigned.  Campbell was serving as Commissioner when Jayne Pierce was demoted to firefighter in May 2009, but even if this could constitute retaliation against Mr. Pierce, the decision was made by Olsen and there is no indication that Campbell was involved.

Thus, even if Campbell harbored any political animus toward Pierce,[1] Campbell was not involved in any materially adverse employment action following the Wool campaign or Mr. Pierce's October 2009 letter and thus cannot have engaged in retaliation.

### 2.  Mycock and Field

Mycock and Field, meanwhile, were involved in adverse employment action against Mr. Pierce, including his termination in April 2011.  But Mr. Pierce has failed to adduce any evidence of political animus on the part of these Commissioners.  To start, even if Campbell harbored animus toward Mr. Pierce, such animus cannot be imputed to Mycock and Field solely based on their service together on the same Board.  *Cf. Vazquez* v. *Lopez-Rosario*,

---

[1]The record evidence on this issue is essentially limited to one conversation with Pierce and a general allegation of friendship between Campbell and Olsen, against whom the claim for animus is stronger, *see infra* Part III.C.

134 F.3d 28, 36 (1st Cir. 1998).  And, contrary to any indication of animus, Mycock may have even *supported* William Wool, given that he also appreciated the potential conflict of interest in having a Union firefighter like Campbell on the Board.

The most Mr. Pierce can do is point to Mycock's admonition, through Olsen, that Mr. Pierce should not campaign while on duty or use Department resources in connection with the campaign.  Mr. Pierce does not argue that this restriction itself was unconstitutional, given the obvious government interests at stake. *Welch*, 542 F.3d at 938; *Pickering v. Bd. of Ed.*, 391 U.S. 563, 568 (1968).  Rather, Mr. Pierce argues that this restriction nevertheless could have been motivated by hostility toward his political activity and evidences animus in later adverse employment actions.  Such an inference is too speculative to be supportive.  Absent any other evidence, Plaintiff cannot meet his burden to show that Mycock's restriction was discriminatory or retaliatory.  Massachusetts law, in fact, requires exactly the sort of restriction Mycock imposed.  Mass. Gen. Laws § 23(b)(2)(ii); Massachusetts State Ethics Commission, *Advisory 11-1: Public Employee Political Activity*.  Mr. Pierce is correct that he need not have the "smoking gun," *Welch*, 542 F.3d at 940, but the lack of any indication that the Commissioners paid any attention to his political activity, beyond reminding him of his clear obligations under the law, remains insufficient.

-19-

### 3.   The Board

The only Commissioner not discussed above who was involved in adverse actions against Pierce, such as the denial of his "step two" grievances or his termination, is Brenda Nailor, who replaced Campbell on the Board and is not even a named defendant in this matter. There is no indication in the complaint or the record as it stands that Nailor was in any way motivated to act against Pierce based on his political activity.

Unable to establish that any of the individual Commissioners took adverse employment action against Mr. Pierce in which his political activity played a substantial or motivating factor, the Board as an entity cannot be subject to liability.

### C.   *Fire Chief Olsen*

Mr. Pierce's claim against Olsen is relatively robust, but remains objectively thin.  Plaintiff has the burden to show that "a causal connection exists linking [Olsen's] conduct, as manifested in the adverse employment decision[s], to [Pierce's] politics." *LaRou* v. *Ridlon*, 98 F.3d 659, 662 (1st Cir. 1996) (internal quotations and citations omitted).  And, as earlier explained, the fact that adverse action followed political activity alone is insufficient to make a *prima facie* case.  *Maymi* v. *Puerto Rico Ports Auth.*, 515 F.3d 20, 28 (1st Cir. 2008); *Acosta-Orozco* v. *Rodriguez-de-Rivera*, 132 F.3d 97, 101 (1st Cir. 1997).  But Mr. Pierce does not rely on timing alone to support

his claim against Olsen.

In his case against Olsen, Mr. Pierce can point to Olsen's expressions of support for Campbell and at least some evidence of close friendship between Olsen and Campbell.  Moreover, Mr. Pierce alleges that Olsen expressed displeasure with his campaigning, particularly against Campbell.

Shortly thereafter, Olsen demoted Mr. Pierce's wife.  Moreover, Olsen then took a variety of more minor adverse actions against Mr. Pierce, such as taking his office and Department-issued cell phone.[2]  Olsen was later responsible for Mr. Pierce's suspensions and recommended him for termination.  Mr. Pierce might argue that the few alleged outbursts from Olsen and Campbell also reflect a "highly-charged political atmosphere," which "combined with the fact that plaintiffs and defendants are of competing political persuasions, may be probative of discriminatory animus." *Welch*, 542 F.3d at 940.  Following all of this, Olsen was responsible for Mr. Pierce's suspensions and recommended his termination to the Board.

The problem for Plaintiff is that there is an innocuous explanation for almost every aspect of Pierce's case against

---

[2] Defendants argue that these "miscellaneous workplace slights" suffered by Mr. Pierce cannot constitute material adverse action.  I note, however, that, although not the strongest basis for a claim, a campaign of minor harassments can cumulatively become material. *Barton* v. *Clancy*, 632 F.3d 9, 29 (1st Cir. 2011).

Olsen.  Accordingly, Defendants argue there can be no liability because Olsen would have made the same decisions "even in the absence of the protected conduct."  *Mt. Healthy City Sch. Dist. Bd. of Educ.* v. *Doyle*, 429 U.S. 274, 287 (1977).

Mr. Pierce, for example, says that any ethics concerns were pretextual, given that he and his wife worked together for many years before anyone at the Department raised the issue.  But Olsen was only appointed in 2008 and was plainly developing initiatives treating domestic relationships more seriously as ethics issues than past chiefs.  This is borne out by Olsen's circulation of his draft familial policy, which predated any of David Pierce's participation in the Wool campaign, as well as the April 2009 incident involving Jayne Pierce.

With respect to the various harassments Mr. Pierce allegedly suffered over the course of 2009, Olsen once again has legitimate arguments that they were unrelated to Mr. Pierce's political activity.  For example, Mr. Pierce's office was taken due to space constraints and was re-purposed as firefighter sleeping quarters and a computer room.  Olsen took Mr. Pierce's Department-issued cell phone, a privilege no one else in the Department had, because Olsen determined it would be more useful to make the phone available to whichever officer was on duty.  Mr. Pierce complains about not receiving the position of Deputy Chief; but no one had ever held--and the Department has never funded--such a position.

Mr. Pierce also recounts one occasion on which Olsen lashed out at him, but on that occasion Olsen lashed out at several members of the Department for being disorganized, diminishing any inference that the incident was politically-motivated as to Pierce.

Finally, of course, Olsen can argue that legitimate ethical concerns motivated his decisions to suspend Pierce, and to recommend him for termination.

To be sure, the *Mount Healthy* defense is demanding.  Unlike, for example, the Title VII burden-shifting framework, under § 1983 Plaintiff does not bear the burden of showing that any purported non-discriminatory explanation by Defendants is pretextual; rather, the Defendants "bear[] the burden of persuading the factfinder that [their] reason is credible."  *Welch*, 542 F.3d at 941; *see also Jirau-Bernal* v. *Agrait*, 37 F.3d 1, 4 (1st Cir. 1994) (summary judgment warranted "only if defendants' evidentiary proffer compel[s] the finding that political discrimination did not constitute a 'but for' cause" for adverse employment action).

Nevertheless, I find that the competing narratives, fueled on Plaintiff's side by speculative suggestion, do not raise a genuine issue of fact to support the proposition that Mr. Pierce's political activity was a "but for" cause of Olsen's alleged adverse employment actions against him.  Evidence that political activity was a motivating factor in any of Olsen's action is simply insufficient.

**D.   *Fire District***

The parties agree that the Fire District may be subject to municipal liability under § 1983 if the decisionmaker taking adverse action against Pierce possessed "final authority to establish municipal policy with respect to the action ordered." *Welch*, 542 F.3d at 927.  I have already determined there is no genuine issue to support the proposition that any municipal actor engaged in unconstitutional action.  The District thus cannot be subject to liability on account of the actions of those municipal actors.

## IV. TORTIOUS INTERFERENCE

David Pierce alleges in Count II of his complaint that Olsen, Campbell, Mycock, Field tortiously interfered with his contractual relationship with the Cotuit Fire District to act as Fire Captain. In a claim for tortious interference, plaintiff must prove:

> (1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's intentional and malicious interference with it; (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct.

*Comey* v. *Hill*, 438 N.E.2d 811, 816 (Mass. 1982) (internal quotations omitted).

A party to a contract cannot be liable for tortious interference with that contract.  *Harrison* v. *NetCentric Corp.*, 744 N.E.2d 622, 632 (Mass. 2001).  Employment decisions made by a supervisor within the scope of his supervisory duties are also

-24-

privileged, but "Massachusetts treats proof of actual malice as a proxy for proof that a supervisor was not acting on the employer's behalf, and deems such proof sufficient to overcome the qualified privilege." *Zimmerman* v. *Direct Fed. Credit Union*, 262 F.3d 70, 76 (1st Cir. 2001).

Assuming that Olsen, Campbell, Mycock, Field can properly be called Mr. Pierce's supervisors--a seemingly dubious label with respect to the Commissioners--and even assuming there is some evidence of malice, Plaintiff cannot make out a claim for tortious interference. While there may be evidence of malice there is also evidence that Defendants "interfered" with Mr. Pierce's employment based on legitimate concerns about ethical violations. When both malicious and legitimate motives are present, Plaintiff bears the burden to show that his supervisor's "actions were unrelated to any legitimate corporate interest." *Clement* v. *Rev-Lyn Contracting Co.*, 663 N.E.2d 1235, 1237 (Mass. App. Ct. 1996) (quoting *Boothby* v. *Texon, Inc.*, 608 N.E.2d 1028, 1040 (Mass. 1993)); *accord Welch*, 542 F.3d at 944 (supervisor can be liable for tortious interference if malice was the controlling factor for interference).

Mr. Pierce cannot establish that any interference with his employment--from the Board's ethics complaint, to the suspensions by Olsen, to his ultimate termination--were unrelated to any legitimate business interests. As a general proposition, Mr.

Pierce cannot show that these actions were unrelated to real
ethical concerns about his  position of authority over his wife in
a small fire department.  The State Ethics Commission, following
its own investigation, found reasonable cause to believe Pierce
violated the state ethics laws--demonstrating that the Defendants'
ethical concerns were at least not entirely unfounded.

　　　Mr. Pierce, of course, contends this cannot change the fact
that the initial November 2009 complaint was a "sham," given that
it appears to have overstated that Plaintiff engaged in "day to
day supervision of his wife" and "participates in decisions
relating to reappointment, promotion, disciplinary matters and the
like involving his wife."  But the complaint was not as outlandish
as Pierce suggests.  Defendants have catalogued the numerous
occasions on which the Pierces served on shifts together, often
without anyone higher in the chain of command--namely, the
Chief--present on the shift.  Mr. Pierce himself admits that some
of the dispute is semantic, conceding that his supervisory
authority over his wife is "regular" although not "day-to-day."
Moreover, there is no dispute that Mr. Pierce was involved in at
least investigating the altercation his wife had with another
firefighter on April 10, 2009.  At most, the facts supporting the
complaint were slightly overstated, but this does not mean the
complaint was entirely unmoored from legitimate business concerns.

　　　Much the same can be said for Mr. Pierce's eventual

suspension and termination.   True, there may have been less severe means of dealing with the ethical issues.   For example, the Board could have attempted to reach an agreement similar to that eventually reached with the Union--although even the latter arrangement would have interfered with his position as Captain. Alternatively, the Board could have granted Pierce a waiver, but this choice was entirely discretionary.   In any event, given the logistical difficulties of managing the conflict of interest problem in a small fire department, and the widespread complaints from within the Department, Mr. Pierce again cannot show that the chosen course of action was unrelated to legitimate interests.

## V.   MASSACHUSETTS WHISTLEBLOWER STATUTE

Defendants also seek summary judgment on Mr. Pierce's claim in Count III of his complaint under the Massachusetts Whistleblower Act, Mass. Gen. Laws. ch. 149, § 185.

### A.   *Whistleblower Basics*

The Massachusetts Whistleblower Act prohibits retaliatory action by an employer against an employee who engages in whistleblowing activity.   Mass. Gen. Laws. ch. 149, § 185.   At the outset, I pause to identify the employer properly named as defendant in this claim, as well as the relevant retaliatory action and whistleblowing activity.

#### 1.   Employer

Under the statute, an "employer" is limited to "the

-27-

commonwealth, and its agencies or political subdivisions,
including, but not limited to, cities, towns, counties and
regional school districts, or any authority, commission, board or
instrumentality thereof."  Mass. Gen. Laws. ch. 149, § 185(a)(2).
This definition "plainly intends the action be brought against
one's employer and [does] not intend to include everyone who might
be considered in the chain of command."  *Fisher* v. *Commonwealth*,
No. 010613, 2001 WL 1249650, at *1 (Mass. Super. Aug. 23, 2001);
*accord Bennett* v. *City of Holyoke*, 230 F. Supp. 2d 207, 221 (D.
Mass. 2002), *aff'd*, 362 F.3d 1 (1st Cir. 2004) ("The Whistleblower
statute permits only an 'employer' to be sued, not individual
supervisors.").  Here, Mr. Pierce's employer is the Fire District,
and the District is thus the only proper defendant to his
whistleblower claim.

    2.  Retaliatory Action

    Mr. Pierce's suspension and eventual discharge are potential
forms of "retaliatory action" under section 185(a)(5).  Although
entirely discretionary, the Board's refusal to grant him a waiver
from his conflict of interest under Mass Gen. Laws ch. 268A, § 19,
may also constitute retaliatory action in the form of "other
adverse employment action taken against an employee in the terms
of conditions of employment."  Mass. Gen. Laws. ch. 149,
§ 185(a)(5).

    Less clear is whether the Board's November 2009 complaint to

-28-

the State Ethics Commission may itself constitute retaliatory action.  Initiating the customary processes of a State Ethics Commission is an unlikely candidate to be considered on its face retaliation, even when it formed the basis for Mr. Pierce's suspension, given that the CBA allows suspension "for major violations of policy or during investigations of a civil or criminal nature."  Moreover, the Ethics Commission's eventual findings were also considered in the hearings on Mr. Pierce's suspension without pay and termination.  Nevertheless, given the close relationship between the Board's November 2009 complaint and expressly-recognized adverse action under § 185(a)(5), I will treat the complaint itself as a potentially retaliatory action.

   3.   <u>Whistleblowing Activity</u>

   Mr. Pierce refers to his October 2, 2009 complaint to the Board as the relevant "initial whistleblowing activity."  In claiming whistleblower protection for this activity, he oddly invokes § 185(b)(1), which prohibits an employer from retaliating against an employee who "[d]iscloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice **of the employer** . . . that the employee reasonably believes is in violation of a law."  Mass. Gen. Laws ch. 149, § 185(b)(1) (emphasis added).  Mr. Pierce's October 2009 "whistleblower complaint," however, discloses only allegedly unlawful conduct by Olsen.  As earlier discussed, Olsen is not an "employer" for

-29-

purposes of the statute.   It appears likely, then, that Plaintiff means to invoke § 185(b)(3), which prohibits retaliatory action when an employee "[o]bjects to . . . any activity, policy or practice which the employee reasonably believes is in violation of the law."   Mass. Gen. Laws ch. 149, § 185(b)(3).

Although Mr. Pierce's opposition to summary judgment is silent on additional theories of whistleblower retaliation, his complaint also includes allegations of retaliation based on "complaints to various public bodies including the State Ethics Commission [and] the Division of Labor Relations."

In his June 24, 2010 letter to the State Ethics Commission, Mr. Pierce mentions his belief that he was denied waiver from his conflict of interest under Mass Gen. Laws ch. 268A, § 19, in retaliation for other claims against the Town of Cotuit.   Even if this constituted whistleblowing activity, it would fall under § 185(b)(1) as disclosure to an outside public body.   *See Dirrane* v. *Brookline Police Dept.*, 315 F.3d 65, 73 (1st Cir. 2002). Moreover, there is no indication that Pierce satisfied the notice requirement of § 185(c)(1).   Consequently, Mr. Pierce cannot claim the protection of § 185(b)(1) because he did not give written notice to the Board that he considered his denial of an exemption illegal and retaliatory and did not give the Board an opportunity to respond or correct the activity.

The same notice failure applies to any alleged whistleblowing activity in his complaints to the Massachusetts DLR.   Moreover, at

-30-

least the second of those complaints, objecting to the Union's
settlement of grievances, followed Mr. Pierce's termination.
There was thus no subsequent adverse action that could have
constituted retaliation for any purported whistleblowing.

**B.  *Waiver* / Estoppel**

Defendants argue that Mr. Pierce's pursuit of various other
avenues of relief--including the CBA-prescribed grievance process,
administrative proceedings before the Massachusetts DLR, and state
court litigation regarding the state Open Meeting Law, Mass. Gen.
Laws ch.30A §§ 18-25--operate to waive his whistleblower claim.

The Whistleblower Act provides that the filing of a civil
action under Mass. Gen. Laws ch. 149, § 185(d), "shall be deemed a
waiver by the plaintiff of the rights and remedies available to
him, for the actions of the employer, under any other contract,
collective bargaining agreement, state law, rule or regulation, or
under the common law."  Mass. Gen. Laws ch. 149, § 185(f).  By its
plain language, the waiver provision operates only in one
direction.  Although the filing of a whistleblower claim waives a
plaintiff's entitlement to other remedies, the pursuit of other
remedies does not waive a whistleblower claim.  Defendants have
cited no case that deviates from this pattern.  *Cf. Bolduc* v.
*Webster*, 629 F. Supp. 2d 132, 138 (D. Mass. 2009) (dismissing
state civil rights action given institution of whistleblower
claim).

Defendants argue that Mr. Pierce is nevertheless estopped from asserting his whistleblower claim because he previously withdrew the claim to ensure he could obtain remedies under the CBA grievance process.  Mr. Pierce sought dismissal of his whistleblower claim without prejudice because he feared losing this avenue of redress in the event the Union decided not to pursue a scheduled June 6, 2011 arbitration regarding Pierce's suspensions, and eventual arbitration regarding his discharge.  On May 5, 2011, I allowed the dismissal without prejudice, but reserved Defendants' ability to argue that reinstating the whistleblower claim would be improper if and when Pierce attempted to do so.  Shortly thereafter, on May 8, 2011, the Union settled the grievance, and Pierce's whistleblower claim was reinstated on August 4, 2011.

I find that Plaintiff is not estopped from asserting his whistleblower claim.  To be sure, by filing his whistleblower complaint against the District, he waived his right to any remedies obtained for him by his Union in the CBA grievance process.  *Cf. City of Everett v. Int'l Bhd. of Police Officers, Local 633*, No. 02-2727, 2003 WL 1699353, at *4 (Mass. Super. Mar. 27, 2003) (employees who filed whistleblower complaint did not interfere with Union's ability to proceed with arbitration, but were not entitled to remedies obtained in arbitration).  Simply dismissing his whistleblower complaint did not change this fact, given that the waiver operated upon "institution" of his private

whistleblower action.  Mass. Gen. Laws ch. 149, § 185(f); *Reilly* v. *Robbins*, No. 05-11806-RWZ, 2006 WL 1892245, at *1 (D. Mass. July 10, 2006) (emphasizing that the *institution* of whistleblower action triggers waiver).  But the Board effectively disregarded Mr. Pierce's waiver of non-statutory remedies by allowing him to reap the benefits of the settlement agreement and return to work pursuant to that agreement.  The Board could have made its act of grace contingent upon a stipulation by Mr. Pierce not to reinstate the whistleblower claim--which he never conceded was no longer viable--but did not do so.

**C.  *No Genuine Dispute***

Defendants also argue that Mr. Pierce's theory of whistleblower retaliation is based entirely on mere "assertion or speculation."  *Shea* v. *Emmanuel Coll.*, 682 N.E.2d 1348, 1350 (Mass. 1997).

To succeed on his whistleblower claim, Plaintiff must show that: (1) he objected to activity that he reasonably believed was unlawful; (2) his objection played a substantial or motivating part in the adverse employment action against him; and (3) that retaliatory action caused him damages.  *Larch* v. *Mansfield Mun. Elec. Dept.*, 272 F.3d 63, 67 (1st Cir. 2001).

Mr. Pierce's theory of retaliation relies heavily on the fact that the Board had not raised conflict-of-interest issues during the entire time he and his wife served together in the Department. Suddenly, in direct response to his October 2009 complaint about

-33-

Olsen, the Board raised what Pierce claims are overblown ethical concerns.  The Board then complained to the Ethics Commission, and in short order Mr. Pierce had been suspended and terminated.

The claim is thin at best.  Given the inadequate evidence of the political discrimination claim against Olsen, discussed above, it is debatable whether Mr. Pierce even had a reasonable belief that Olsen had acted in violation of the law.  Moreover, there is little evidence, beyond Mr. Pierce's arguments about the timing of the Board's actions, to indicate it had any relation to his complaint.  Mr. Pierce cannot point to any evidence that the Board had been trying to conceal Olsen's activities, was worried about exposure of those activities, or was trying to protect Olsen.  Neither can Mr. Pierce identify a "pattern of retaliation," as present in some cases.  *Welch*, 542 F.3d at 943.

Mr. Pierce has also done little to undercut the Board's legitimate concern with ethical violations.  To the contrary, the Ethics Commission confirmed that those concerns were justified.  Moreover, the Board has a fact-based compelling counter-narrative to the speculative inferences Mr. Pierce hopes to draw from the timeline of events.  According to Defendants, ethics issues had come to the fore in Spring 2009 because of the incident involving Jayne Pierce and Lyons and her letter regarding potential conflict of interest.  An exploration of the ethical quagmire in which the Department found itself ensued, and the products of that study

were ready to be presented to Mr. Pierce by the Fall.

Defendants' settlement negotiations, and eventual agreement, with the Union further undercut an inference of retaliatory intent.  *Cf. Estock* v. *City of Westfield*, 806 F. Supp. 2d 294, 310 (D. Mass. 2011).  The Department's agreement to allow Pierce to return to work, albeit in a role where he could not possibly supervise his wife, is plainly consistent with a good faith desire to resolve conflict-of-interest issues; it does not support a finding of spiteful effort to retaliate against a whistleblower.

True, "the issues of reasonable belief and retaliatory intent are relatively fact-based determinations," and both the Whistleblower Act itself and limited caselaw available "provide[] little guidance as to the correct application of the statute." *Walker* v. *City of Holyoke*, 523 F. Supp. 2d 86, 114 (D. Mass. 2007).  Nevertheless, I find as a matter of law that Plaintiff cannot meet his burden to show a causal connection between his purported whisteblowing activity and the alleged retaliation against him.  The mere sequence of events is insufficient to establish that adverse employment actions following Pierce's complaint about Olsen were motivated by his complaint about Olsen. Pierce has no other indicia of retaliatory intent.  *Cf. Putnam* v. *Town of Saugus*, 365 F. Supp. 2d 151, 195 (D. Mass. 2005) (in addition to mere sequence of events, manager expressed he had a "problem" with plaintiff's handling of reporting incident).

-35-

## VI.   SETTLEMENT AGREEMENT

Defendants also argue that Mr. Pierce's claims are precluded based on his acceptance of the benefits of the Union settlement--an argument Defendants frame under the doctrines of waiver, accord and satisfaction, estoppel, and res judicata.

These arguments barely warrant discussion.  Under the CBA governing Mr. Pierce's employment, a grievance must involve "an alleged violation of a specific provision of this Agreement." Similarly, the CBA provides that "[n]o dispute or controversy shall be subject to arbitration unless it involves an alleged violation of a specific provision in this Agreement."  Thus, the grievance process dealt with contractual matters entirely distinct from Mr. Pierce's independent statutory claims for political and whistleblower retaliation.  Even assuming Pierce accepted the benefits and burdens of the settlement agreement, with the Union's promise to withdraw with prejudice grievances respecting Mr. Pierce's suspensions and discharge, that agreement could only bar additional litigation regarding contractual claims.  Pierce did not agree to waive his independent political retaliation and whistleblower claims.  Resolution of the grievances had no bearing on Pierce's independent statutory claims for political and whistleblower retaliation.  *Cf. Blanchette* v. *Sch. Comm. of Westwood*, 692 N.E.2d 21 (Mass. 1998) (doctrines of preclusion, waiver, and estoppel did not prevent employee who prevailed in

arbitration, where CBA grievance process limited itself to contractual violations, from bringing independent claim for discrimination under state law).

## VII. CONCLUSION

For the reasons set forth more fully above, Defendants' motion for summary judgment is GRANTED.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT